UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | Criminal Action |
| | * | No. 00-104 |
| Plaintiff, | * | |
| | * | Section "B" |
| v. | * | |
| | * | New Orleans, Louisiana |
| MICHAEL ANDREW GRAVES, | * | July 21, 2005 |
| | * | |
| Defendant. | * | |

* * * * * * * * * * * * * * * *


REVOCATION HEARING,
BEFORE THE HONORABLE IVAN L.R. LEMELLE,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          United States Attorney's Office
                            By:  G. DALL KAMMER, ESQ.
                            Hale Boggs Federal Building
                            500 Poydras Street, Room 210
                            New Orleans, Louisiana 70130


For the Defendant:          U.S. Public Defender's Office
                            By:  GEORGE CHANEY, JR., ESQ.
                            Hale Boggs Federal Building
                            500 Poydras Street, Room 318
                            New Orleans, Louisiana 70130


Court Audio Operator:       Bonnie G. Hebert

Transcriptionist:           Dorothy Bourgeois
                            c/o U.S. District Court
                            500 Poydras Street, Room C151
                            New Orleans, Louisiana 70130
                            (504) 589-7721


Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

2

# **I N D E X**

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Stephanie Williams | 7 | 8 | 14 | 23 |
| Mildred Graves | 26 | -- | -- | -- |
| Michael Graves | 32 | 58 | 68 | -- |

| GOVERNMENT EXHIBITS: | Marked | Received |
|---|---|---|
| G-1  Pawn Receipt Ticket | 58 | 71 |
| G-2  NSF Check | 59 | 71 |

| COURT EXHIBITS: | Marked | Received |
|---|---|---|
| No. 1  Worthless Check Contract | 26 | 26 |

1                    P R O C E E D I N G S

2                  (Thursday, July 21, 2005)

3                (Call to Order of the Court)

4          THE COURT:  Good afternoon.  Court is in session.  Be

5    seated, please.

6          MR. KAMMER:  Good afternoon, Your Honor.

7          MR. CHANEY:  Good afternoon, Your Honor.

8          THE COURT:  All right.  We are on Criminal Action 00-

9    104, *United States v. Michael Graves*.  Counsel, make your

10   appearances, please.

11         MR. KAMMER:  Good afternoon, Your Honor.  Dall Kammer

12   standing in for Carter Guice for the United States.

13         MR. CHANEY:  Good afternoon, Your Honor.  George

14   Chaney on behalf of Michael Graves who is present in court.

15         THE COURT:  All right.  Mr. Graves, your full name,

16   sir, for the record?

17         THE DEFENDANT MICHAEL GRAVES:  Michael Andrew Graves.

18         THE COURT:  All right.  Mr. Graves, you're up today

19   on a petition that asks the Court to revoke your supervised

20   release term that began back in December of 2003.  You recall

21   that you were placed on supervisory release as a result of a

22   plea of guilty in 2001 to a bank fraud charge.  It was an 18

23   months sentence followed by five years supervised release with

24   the restitution of $15,295.  The petition alleges some

25   violations involving new criminal activity, failing to report

4

 1   to probation as instructed; failure to make the court-ordered

 2   restitution payments.

 3           Have you had a chance to go over the petition with

 4   your attorney?

 5           THE DEFENDANT MICHAEL GRAVES:  Briefly, Your Honor.

 6           THE COURT:  All right.  Mr. Chaney, Mr. Graves'

 7   response to the petition, true, not true?

 8           MR. CHANEY:  Not true, Your Honor.  We wanted to go

 9   forward on the hearing, Your Honor.

10           THE COURT:  All right.  Is the Government ready to

11   proceed?

12           MR. KAMMER:  Yes, Your Honor.

13           THE COURT:  Is the Defense ready to proceed?

14           MR. CHANEY:  We are, Your Honor.

15           THE COURT:  All right.  Call your first witness,

16   Mr. Kammer.

17           MR. KAMMER:  Your Honor, to start off, the Government

18   would offer a stipulation to the Defense that if called to

19   testify the U.S. Probation Office would testify --

20           MR. CHANEY:  No.

21           MR. KAMMER:  -- consistent with the petition that was

22   filed in this court, as well as the dispositional report that

23   was filed yesterday evening.

24           THE COURT:  So, not to the truthfulness of it but

25   that's what the probation officer would say?

1          MR. KAMMER:  That's what the probation officer would

2   say, Your Honor.

3          THE COURT:  All right.  The reporting of the

4   information.  Mr. Chaney?

5          MR. CHANEY:  Your Honor, given the fact that we

6   contest the contents of it and it was our position that we

7   wanted to have the probation officer subject to talk to this

8   Court about the violations, we cannot stipulate to the

9   substance of the report.

10          THE COURT:  All right.  Why don't I do this:  You're

11   not stipulating to the substance but that if she was called,

12   this is what she would say.  You're not stipulating to the

13   truth or substance.  Why don't you do this:  If you want to

14   call her to have her explain some things, I'll give you that

15   right to do that on defense.  We'll go forward because the

16   report is already part of the record.

17          MR. CHANEY:  I understand, Your Honor.

18          THE COURT:  And then you can call her on your side on

19   cross.

20          MR. CHANEY:  All right.  Your Honor, the problem is

21   that the report was prepared by Agent Cornell Manuel.  He is

22   not present today.  He is the writer of the dispositional

23   report.  He is the writer of the petition and --

24          THE COURT:  Where is Mr. Manuel?

25          MR. KAMMER:  Your Honor, it's my understanding that

1   he's out of town right now.  This situation, I also understand,

2   was brought up to the defense, but the defense did not want a

3   continuance of this date, so that's why we're all here today.

4        THE COURT:  You were aware that he wasn't going to be

5   available?

6        MR. CHANEY:  Your Honor, Mr. Manuel told me that he

7   was looking to go out of town.  I explained to him that I could

8   not agree to continue this without my client's permission.  My

9   client has been held in custody since he was arrested --

10        THE COURT:  But did you subpoena Mr. Manuel to come?

11        MR. CHANEY:  I did not subpoena him to come, no,

12   Your Honor.

13        THE COURT:  And it's him that you want to call, or at

14   least get testimony from?

15        MR. CHANEY:  Your Honor, he's the writer of the

16   report, and I wanted to traverse the contents of the report.

17        THE COURT:  I understand.  All right.  Let's do this:

18   You all can both put on whatever evidence that you have from

19   witnesses who may be available, reports or what have you.  If

20   you still want to call Manuel, I'll hold it open until you all

21   get him in here.

22        MR. KAMMER:  Your Honor, it may be -- the Government

23   has always been in the position of wishing -- being willing to

24   continue this until Cornell can be here for this hearing, and

25   we still would offer that to the defense, if he would like to

1    question Cornell, I mean.  Stephanie Williams is here,

2    Your Honor, to authenticate that this was filed by the

3    probation officer -- by the probation office and I don't --

4            THE COURT:  Counsel, if he wants to call a witness,

5    he has the right to call a witness.

6            MR. KAMMER:  Okay, Your Honor.

7            THE COURT:  I'm holding it open to give him that

8    opportunity.

9            MR. KAMMER:  Okay, well --

10           THE COURT:  Now, do you have a witness to call.

11           MR. KAMMER:  Your Honor, we would call Stephanie

12   Williams to the stand.

13           THE COURT:  All right.  Ms. Williams.

14           MR. CHANEY:  Thank you, Your Honor.

15                   *   *   *   *   *

16   **STEPHANIE HARRELL WILLIAMS, GOVERNMENT'S WITNESS, SWORN**

17                   *   *   *   *   *

18                   DIRECT EXAMINATION

19   BY MR. KAMMER:

20   Q.   Ms. Williams, are you familiar with -- I'm sorry, Cornell;

21   what is Cornell's last name?

22   A.   Cornell Manuel.

23   Q.   Okay.  And are you familiar with Mr. Manuel?

24   A.   Yes, I am.  I supervise Mr. Manuel.

25   Q.   Okay.  And are you familiar with the dispositional report

1    that was filed in this case as well as the petition that was

2    filed in this case, against Mr. Graves?

3    A.   Yes, I am.

4    Q.   Did you have a chance to speak to Mr. Manuel about his

5    findings?

6    A.   Yes, I did.

7    Q.   Okay.  Did you review both of these reports that I've

8    mentioned?

9    A.   Yes, I did.

10   Q.   Do you believe that these statements are consistent with

11   the probation office's position regarding Mr. Graves?

12   A.   Yes, I do.

13   Q.   Okay.

14            MR. KAMMER:  Your Honor, at this time I'll tender.  I

15   mean, if Mr. Chaney has any questions of her, I would just rest

16   on -- I'm just going to -- I would just be questioning her as

17   to the contents of this report, so I can redirect if need -- if

18   necessary.

19            THE COURT:  Any questions on cross?

20            MR. CHANEY:  I do, Your Honor.

21                      *    *    *    *    *

22                      CROSS-EXAMINATION

23   BY MR. CHANEY:

24   Q.   Ms. Williams, with respect to this matter, you did not

25   ever supervise Mr. Graves, did you?

1  A.    No, I did not.

2  Q.    With respect to Mr. Graves either compliance or non-

3  compliance with the conditions of his supervised release; you

4  do not have any personal knowledge regarding the level of

5  compliance, do you?

6  A.    Yes, I do, in that I do supervise Cornell Manuel.

7  Q.    Okay.

8  A.    And in supervising Mr. Manuel, all reports of non-

9  compliance have to be signed off by me.

10  Q.    Okay.

11  A.    So, in that way I am familiar with the case.

12  Q.    Okay.  As a part of your responsibilities did you, in

13  fact, do an investigation to follow up the substance of the

14  allegations made in the dispositional report?

15  A.    We do make sure that an officer has conducted a thorough

16  investigation of all matters that are alleged.

17  Q.    That's not what I'm asking.  I'm asking:  Did you

18  personally talk with the individuals who made allegations which

19  have been recounted in the dispositional report?

20  A.    No, I did not.

21  Q.    Okay.  So, none of the witnesses that Mr. Manuel spoke to

22  -- you did not have conversations with any of those witnesses?

23  A.    No, I did not.

24  Q.    You didn't have an opportunity to evaluate those witnesses

25  in any way, did you?

1   A.    No, I did not.

2   Q.    Okay.  So, with respect to the truthfulness of anything

3   that they may have said, you had no basis upon which you could

4   attest for them or say whether or not the information was

5   correct; is that fair to say?

6   A.    We do have some information that was provided to us by

7   those victims.

8   Q.    Okay.

9   A.    And I can say that those -- that information that was

10  provided was reviewed by me.  But personal contact, one on one,

11  no.

12  Q.    Okay.

13  A.    Uh-huh. (affirmative response)

14  Q.    So again, with respect to the information that was

15  provided to you.

16  A.    Uh-huh. (affirmative response)

17  Q.    That information; have you given it to the Government or

18  given it to defense counsel, any of those items?

19  A.    No.

20  Q.    Okay.

21  A.    Well, the --

22  Q.    The items you're talking about, specifically, what are

23  they?

24  A.    Or alleged in the dispositional report.

25  Q.    Okay.  Specifically, what items did you review in

1   connection with this case file?

2   A.   The agreement that was signed by Ms. Elnora Alston.

3   Q.   Okay.

4   A.   An agreement from the Orleans Parish District Attorney's

5   Office, and we are in receipt of a -- from a pawn shop that

6   Mr. Graves alleged that he pawned a ring.

7   Q.   Okay.

8   A.   And we're in receipt of that pawn shop receipt.

9   Q.   But Ms. Elnora Alston is not being supervised by your

10  office, correct?

11  A.   No, she's not.

12  Q.   And with respect to the agreement that's signed, it has

13  nothing -- well, it does not have any reference to Michael

14  Graves, does it?

15  A.   Yes, it does.

16  Q.   Okay.  And the reference is that Mr. Graves -- what?

17  A.   Is --

18  Q.   What is it?  What's the connection?

19  A.   Is the person who owes the money.

20  Q.   Okay.

21  A.   Uh-huh. (affirmative response)

22  Q.   Owes a certain amount of money --

23  A.   Owes money to Ms. Taplin.

24  Q.   Okay.  Now, with respect to Ms. Taplin; is there any

25  outstanding case where Ms. Taplin charged Mr. Graves with

 1  anything?

 2  A.    No.

 3  Q.    Okay.  So, the --

 4  A.    Other than the amount of restitution owed to her by --

 5  Q.    Okay.

 6  A.    -- Mr. Graves.

 7  Q.    So, there was a contested issue between Ms. Taplin and

 8  either Mr. Elnora --

 9  A.    Alston.

10  Q.    -- Alston, or Mr. Michael Graves and that matter was

11  resolved via an agreement by which restitution or a repayment

12  was to be made?

13  A.    Yes.

14  Q.    But there was not criminal case filed against Mr. Graves

15  in connection with that?

16  A.    That is correct.

17  Q.    Okay.  With respect to the ring or the pawning of the

18  ring.

19  A.    Uh-huh. (affirmative response)

20  Q.    Was there any police report alleging that a ring had been

21  either stolen by Mr. Graves from any specific victim?

22  A.    No.

23  Q.    Was there any report saying that Mr. Graves had received

24  stolen property and then pawned that property in any way?

25  A.    Other than -- no, you said a report?  Other than --

1   Q.   A police report.

2   A.   No.

3   Q.   Okay.

4   A.   There wasn't.

5   Q.   So, with respect to the items, that none of those items

6   were criminal matters which were being prosecuted by any

7   criminal -- by any prosecuting authority, either a district

8   attorney, a county attorney, city attorney or a U.S. attorney;

9   is that fair to say?

10  A.   That's fair to say with the exception of the matter with

11  Ms. Alston, because the document -- and I don't have it before

12  me, but the document from the District Attorney's Office does

13  indicate that a warrant would be issued if the agreement wasn't

14  met.

15  Q.   Okay.  So, on a condition that the amounts that were to be

16  repaid were not being paid?

17  A.   Right.

18  Q.   Then there was a provision within that agreement that a

19  warrant could be issued?

20  A.   Right, on Mr. Graves.

21  Q.   And to date, no warrant has been issued?

22  A.   Correct.

23  Q.   And is it your belief that the agreement has been honored

24  by Ms. Alston?  He's been paying what was owed?

25  A.   I have no knowledge of that.

1   Q.    Okay.

2           MR. CHANEY:  I have nothing further with respect to

3   this witness, Your Honor.

4           THE COURT:  All right.

5           MR. KAMMER:  Very briefly, Your Honor.

6                       *    *    *    *    *

7                       REDIRECT EXAMINATION

8   BY MR. KAMMER:

9   Q.    Mr. Chaney was asking you about the $400 pawn of this

10  ring?

11  A.    Yes.

12  Q.    Did you get an admission from the Defendant or did your

13  officer get an admission from the Defendant that he had, in

14  fact, pawned that ring for $400?

15  A.    Yes.  Mr. Graves did report that to Mr. Manuel.

16  Q.    And how did that ring come into his possession?

17  A.    (No response.)

18  Q.    How was the ring bought from Zales Jewelry?

19  A.    The ring was bought with funds deposited into Ms. Taplin's

20  account and by a check that was --

21          MR. CHANEY:  Objection to hearsay, Your Honor.  This

22  is --

23          THE COURT:  Overruled, Counsel.

24          MR. KAMMER:  This is a sentencing hearing,

25  Your Honor.

Williams - Redirect                                              15

1              THE COURT:  This is admissible in a revocation

2    proceeding.

3              MR. KAMMER:  Continue, Ms. Williams.

4              THE COURT:  I do consider whether or not I give

5    weight to it in view of that objection though.

6              MR. CHANEY:  I understand, Your Honor.

7    BY MR. KAMMER:

8    Q.   All right.

9    A.   As reported by Ms. Taplin, the ring was purchased when she

10   received a check from Mr. Graves that she deposited into her

11   checking account.  And then, they purchased a ring and then the

12   next day or the next few days, the check came back insufficient

13   funds.

14   Q.   Okay.  And that same idea of giving checks to somebody and

15   then purchasing something; that also applied with Ms. Taplin?

16   A.   Yes.

17   Q.   And what was that for the purchase of?

18   A.   That was for Ms. Taplin -- well, that was for jewelry for

19   Ms. Taplin, as well as --

20   Q.   One, two, three -- per this report, three automobiles?

21   A.   For three automobiles, but it was with different

22   individuals.

23   Q.   Okay.

24   A.   To a total of three automobiles.

25   Q.   Regarding the agreement that you mentioned, and we just

1  have your copies here.  I just saw it myself a second or two

2  ago.  Is this the agreement that you were referring to

3  (indicating)?

4  A.    Yes, it is.

5  Q.    Okay.  And that bottom is signed by Ms. Alston?

6  A.    Yes.

7  Q.    So, she agreed to pay this money back for what the

8  District Attorney's Office alleges is a debt owed by

9  Mr. Graves?

10  A.    Yes.

11  Q.    She agreed to pay for that, correct?

12  A.    Yes.

13  Q.    Who is Ms. Alston?

14  A.    Ms. Alston, as reported to Mr. Manuel, is a current or a

15  past girlfriend of Mr. Graves.

16  Q.    I'd also like to -- there's a third person involved with

17  these worthless checks, is Ms. Christy Brown; is that correct?

18  A.    Yes.

19  Q.    And what was she?  Was she the one that purchased the

20  ring?

21  A.    (No response.)

22  Q.    From Zales?

23  A.    Yes.

24  Q.    Okay.

25  A.    No, well, I'm not certain -- yes, she is.  A ring -- she

1   did a ring and a car.

2   Q.   I'm sorry.  And then, the other one was Ms. Arlana Aples?

3              MR. CHANEY:  Objection, leading, Your Honor.  This

4   testimony is coming from the prosecutor --

5              THE COURT:  Rephrase, Counsel.

6   BY MR. KAMMER:

7   Q.   Was there another person that bought anything else besides

8   the ring and the automobiles from Mr. Graves?

9   A.   Yes, and Ms. Christy Brown.

10  Q.   Okay.  And did anybody buy anything from Mr. Graves on or

11  about May 25th, 2005?

12  A.   (No response.)

13  Q.   A motorcycle, perhaps?

14             MR. CHANEY:  Objection, leading.

15             THE WITNESS:  I have to -- yes

16  BY MR. KAMMER:

17  Q.   Okay.

18  A.   A Miss Arlana Aples reported that she also purchased a

19  motorcycle from Mr. Graves.

20  Q.   Was this the same situation as before?

21  A.   Yes.

22  Q.   An insufficient fund check?

23  A.   Yes.

24  Q.   That she said was --

25  A.   She reported that Mr. Graves gave her a check to place in

1    her account from someone else.  His name was not on the check,

2    it was another check.  She put it in the account and it, too,

3    came back insufficient funds, non-sufficient funds.

4    Q.    Now, as far as the outside of this insufficient check

5    scheme that was going on, let's talk about the violations of

6    the conditions that this Court set for the Defendant to abide

7    by on his supervised release.

8    A.    All right.

9    Q.    First of all, did he attend his meetings with the

10   probation officer in this case?

11   A.    No.  He missed several meetings with the probation

12   officer.  He failed to -- Mr. Manuel set up meetings with him

13   via telephone and he never made those appointments.

14   Q.    How many?  How many meetings did he miss?

15   A.    He failed to show for five appointments.

16   Q.    Did he explain why he missed those?

17   A.    No, he did not.

18   Q.    Did he call the probation officer and give an excuse, at

19   all?

20   A.    No, he did not.

21   Q.    Did Mr. Graves continually submit his monthly supervision

22   reports?

23   A.    No, he did not submit them in a timely manner.

24   Q.    Mr. Graves was ordered to pay restitution in this case.

25   Has he done that?

Williams - Redirect                                    19

1   A.   He was ordered to pay restitution and he has made a couple

2   of payments, but he has not met the court ordered amount, and

3   he is delinquent.

4   Q.   During this entire time, was he unemployed or was he

5   employed and could have made these payments?

6   A.   He was employed and could have made payments.

7   Q.   At one time, how much money was he making; could you tell

8   the Court at that time period?

9   A.   He was making $1,600 per -- $1,600 per month from December

10  '04 to April of 2005.

11          MR. KAMMER:  Your Honor, I don't have any further

12  questions.

13          MR. CHANEY:  No further questions of this witness,

14  Your Honor.

15          THE COURT:  The instances of failure to submit a

16  report to probation or to report as ordered; do you recall how

17  many times he failed to report?

18          THE WITNESS:  That he failed to submit the report or

19  that he failed to --

20          THE COURT:  Scheduled appointments.

21          THE WITNESS:  Scheduled appointments?  Five.

22          THE COURT:  And what about reports?

23          THE WITNESS:  The reports were -- several were turned

24  in delinquent and he hasn't submitted a report since March

25  2005.  But the others were submitted delinquent.  It's

Williams - Redirect                                          20

 1  delinquent after the first five working days of the month.

 2           THE COURT:  The restitution amount was originally

 3  $15,295 with, I believe, $250 per month in orderly payments.  I

 4  understand that you've indicated that he's made some payment?

 5           THE WITNESS:  Yes, he's made three payments totaling

 6  $1,250 and he is $3,250 in arrears.

 7           THE COURT:  So the balance is approximately $14,145,

 8  total?

 9           THE WITNESS:  Yes.

10           THE COURT:  The merchandise that were purchased here,

11  the ring, the vehicles; were all of those subsequently returned

12  or seized back to the vendors who sold them, or what?

13           THE WITNESS:  Yes, they were.  However, the victims

14  do report that they have endured some financial hardship in

15  that one woman has to pay the dealership back some damage fee

16  for a car that was returned damaged, and another one has to pay

17  her bank back some money for the deposits.

18           MR. KAMMER:  Your Honor, if I may follow up on that?

19           THE COURT:  All right.

20  BY MR. KAMMER:

21  Q.   Are you referring to Ms. Taplin and the $8,000 check to

22  TeleCheck?

23  A.   Yes.

24  Q.   Is she responsible?  Did TeleCheck honor that check that

25  was written?

1  A.   Yes.

2  Q.   And now she's responsible for paying them back --

3  A.   Yes.

4  Q.   -- the $8,000?

5  A.   As reported by Ms. Taplin.

6  Q.   Okay.

7         MR. KAMMER:  I have just one further question.

8  BY MR. KAMMER:

9  Q.   When this information was brought over to the Orleans

10 Parish District Attorney's Office, was your office ever made

11 aware of this situation by Mr. -- by the Defendant?

12 A.   No, it wasn't reported by the Defendant, it was reported

13 by the victim.

14        THE COURT:  You mentioned an agreement between the

15 DA's office, one of the victims, and Mr. Graves.  Do you have a

16 copy of that agreement?

17        MR. KAMMER:  Your Honor, I do.  I only have the copy

18 that probation has, but I can --

19        THE COURT:  Well, I'm asking probation, Counsel, the

20 witness.

21        THE WITNESS:  No, I don't have a copy before me,

22 Your Honor.

23        MR. KAMMER:  Oh, I'm sorry, Your Honor.

24        THE WITNESS:  But I have reviewed the copy.

25        THE COURT:  What was the date of that agreement?  If

Williams - Redirect                                              22

 1   you have it, show it to the witness.

 2               MR. KAMMER:  Thank you, Your Honor.

 3               THE COURT:  And you can let her identify it.

 4   BY MR. KAMMER:

 5   Q.  Can you identify this document, please, for the Court?

 6   A.  (Witness examines document.)  Yes, this is the -- it's

 7   called a worthless check partial payment contract, and it's

 8   dated May 6th.

 9               THE COURT:  May, what?

10               THE WITNESS:  May 6th.

11               THE COURT:  Of 2005?

12               THE WITNESS:  Yes.

13               THE COURT:  All right.  Have you seen this document,

14   Mr. Chaney?

15               MR. CHANEY:  I have, Your Honor.  Just so that the

16   record is complete, Mr. Graves is not a signatory to this,

17   Your Honor, and there's nothing to suggest --

18               THE COURT:  Well Counsel, just like I don't take

19   testimony from him, I can't take it from you.

20               MR. CHANEY:  Your Honor, I actually -- if --

21               THE COURT:  You need to ask a question.

22               MR. CHANEY:  If I could ask a question, okay.  Can I

23   have the document, please?

24               MR. KAMMER:  (Handing same)

25               MR. CHANEY:  Okay.

1                              *    *    *    *    *

2                         RECROSS-EXAMINATION

3    BY MR. CHANEY:

4    Q.   Ms. Williams, as to that document, that document; you were

5    not present when it was executed, were you?

6    A.   I was not.

7    Q.   And with respect to that document; does that document

8    contain the signature of Michael Graves?

9    A.   No, it does not have his signature on it.

10   Q.   As a matter of fact, with respect to that document, the

11   only signature that appears is the signature of Elnora Alston?

12   A.   No, there are two signatures.  There is the signature of

13   Elnora Alston and the signature of the ECU collector, Irma

14   Gettridge, who prepared this document.

15   Q.   Okay.  With respect to the preparation of this document,

16   do you have any information, personal knowledge as to whether

17   or not Mr. Graves even knew that this document had been

18   executed?

19   A.   Other than his name being on here, and I would assume --

20   Q.   I'm asking you what you know, not any assumptions.

21   A.   Other than his name -- I can't say that he knew because

22   his signature is not on here.

23   Q.   Okay.

24   A.   So I can't say that he was present.

25   Q.   Okay.  Beyond being present, do you have any information

1   to suggest that he even had knowledge that this document was

2   being executed between Ms. Alston and the ECU clerk?

3   A.   No, I can't say that.

4          MR. CHANEY:  I have nothing further with respect to

5   the document, Your Honor.

6          THE COURT:  Well, the document speaks for itself.

7   Let me see the document.

8          MR. CHANEY:  (Handing same)

9          THE COURT:  Do you know whether or not the $250

10  payment that was initially made on this agreement, whether that

11  was cash, money order, or check?  Because it says that it was

12  received from Michael Graves.

13         THE WITNESS:  I'm not aware of what type of payment

14  it was, Your Honor.

15         THE COURT:  It's called a worthless check partial

16  payment contract.  It stated that on May -- "On today, May 6th,

17  I, Irma Gettridge, took a partial payment in the amount of $250

18  from Mr. Michael Graves for a worthless check that was written

19  to Taplin, T-A-P-L-I-N, in the amount of $4,280.  The remaining

20  balance of $4,549.65 of this payment in the amount of $250

21  biweekly should be paid on or about the 15th and 30th of each

22  month.  If payment is not made, payment that was made shall be

23  returned and a warrant for arrest will be placed."

24         It says as collector, this Irma Gettridge and as

25  payee, Elnora Alston.  And you're saying that Elnora Alston is

1   a girlfriend of Mr. Graves?

2            THE WITNESS:  Yes, as reported to Mr. Manuel.

3            THE COURT:  I had a Ms. Taplin who was the one that's

4   the subject of that contract I just reviewed.  I have another

5   individual, was it someone by the name of Christy Brown, you

6   said earlier?

7            THE WITNESS:  Yes, Ms. Christy Brown, Ms. Tamara

8   Taplin and then Ms. Arlana Aples, A-P-L-E-S.

9            THE COURT:  Do you know whether or not Ms. Taplin or

10  whether or not there has been any follow up with the DA's

11  Office for any alleged failure to comply with that worthless

12  check partial payment contract?

13           THE WITNESS:  No, Your Honor.  I'm not aware of that.

14           THE COURT:  Is Ms. Taplin here?

15           MR. KAMMER:  No, Your Honor.

16           THE COURT:  All right.  All right, step down,

17  Ms. Williams.  Thank you.

18           THE WITNESS:  Thank you.

19      (Witness is excused)

20           THE COURT:  Next witness.

21           MR. KAMMER:  Your Honor, the Government doesn't have

22  any further witnesses.

23           THE COURT:  The Government rests.

24           Mr. Chaney?

25           MR. CHANEY:  Yes, Your Honor.  I would call

1    Ms. Mildred Graves.

2              THE COURT:  Ms. Graves.

3              THE CLERK:  Do you want me to make a copy of this

4    after I swear her in?

5              THE COURT:  All right.  I'm filing that worthless

6    check contract as Court Exhibit 1.

7                        *    *    *    *    *

8              **MILDRED GRAVES, DEFENDANT'S WITNESS, SWORN**

9                        *    *    *    *    *

10                       DIRECT EXAMINATION

11   BY MR. CHANEY:

12   Q.   Ms. Graves, where do you live?

13   A.   At 3002 Press Court, New Orleans, Louisiana.

14   Q.   Okay.  What is your relationship to Michael Graves?

15   A.   Mother.

16   Q.   Okay.  And did you know where Mr. Graves was living?

17   A.   Yeah, living with me.

18   Q.   Where was he living?

19   A.   At 3002 Press Court.

20   Q.   Okay.  During the time that he's been on supervised

21   release, has he lived in your home that full time?

22   A.   Yeah.

23   Q.   As a result of him living with you, did you have the

24   opportunity to communicate with Mr. Cornell Manuel in respect

25   to your son?

1  A.   Yeah.

2  Q.   In fact, did Mr. Manuel make visits to your home to visit

3  your son?

4  A.   Right, and when he was off driving, he would come in and

5  talk.  We would have conversations.

6  Q.   Okay.  In fact, did Mr. Manuel call your home from time to

7  time to talk with your son?

8  A.   That's right.  And I'd tell him he on the road, and he had

9  his number and he would call him.

10  Q.   When you say he had his number; how would he reach him on

11  the road or how would you reach him on the road?

12  A.   Call him on the phone.

13  Q.   What type of -- a cell or through a company phone?

14  A.   Cell phone and company phone.

15  Q.   All right.

16  A.   I mean cell phone and house phone.

17  Q.   Okay.  Ms. Graves, do you know the name of the company

18  your son was working for?

19  A.   Oh no, I can't think of the name.  I can't think of it

20  right now.

21  Q.   Okay.  Now, the company; what type of business were they

22  engaged in?

23  A.   Truck driving.

24  Q.   It was a trucking company?

25  A.   Yeah.  Yeah.

1  Q.   And your son; what responsibilities did he have in

2  connection with his employment?

3  A.   He was -- well, they had him to pick up loads and he would

4  go to different towns.

5  Q.   Okay.

6  A.   All over the state, you know how, all over.  I don't --

7  Q.   Was he driving exclusively within the state of Louisiana

8  or did his work take him beyond the borders of Louisiana?

9  A.   It would take him -- it's all over to work.

10 Q.   Okay.  And in fact, when he was driving with the company,

11 would he communicate with Mr. Manuel where he was going --

12 A.   Yeah.

13 Q.   -- and how long he would be there?

14 A.   Yeah, and if he would, I would -- he would come by and I'd

15 tell him where he was, and then he would call or something.

16 There wasn't no hard words never said.

17 Q.   Okay.  With respect to your son and his supervision by

18 Mr. Manuel; did Mr. Manuel understand that your son's work

19 would take him outside of Louisiana?

20 A.   Yeah.

21 Q.   And had he, in fact, given him approval --

22 A.   Yes.

23 Q.   -- to do jobs outside of Louisiana?

24 A.   That's right.

25 Q.   Okay.  Now, with respect to your son's work schedule; did

1  he have a regular work schedule where he went in at 9:00 in the

2  morning and came home at 5:00 p.m.?

3  A.    No.

4  Q.    How was his work schedule?  How would he work?

5  A.    Well, when they'd call him sometimes he would leave like

6  10:00 at night or wherever he had to be for a certain time, you

7  know, like that.

8  Q.    Okay.  And when he was gone, would he be gone for the

9  standard -- a regular amount of time, one day, two days, or

10  might it be --

11  A.    No, sometimes it would be two to three to four weeks

12  before he'd come back.

13  Q.    Okay.  And in those instances where he got a call where he

14  had to report somewhere, how would he handle, if he had to

15  visit with his -- with Mr. Manuel during that time frame?  How

16  was that normally handled between him and Mr. Manuel, if you

17  know?

18  A.    He said he would talk to him on the phone.  I would ask

19  him if he called and he'd say, "Yeah, I done called."  So, it

20  wasn't never no problem until --

21  Q.    Okay.  And if Mr. Manuel ever called you and said:  I have

22  not heard from your son.  Do you know where he is, or do you

23  know how I can contact him?  Would you --

24  A.    And I would call and tell him and he said, "I done called

25  Mr. Manuel."

1    Q.   Okay.  Now, with respect to your son's employment, did at

2    some point he stop working at the truck --

3    A.   Yeah.  Yes, he did.

4    Q.   Okay.  And when he stopped working at the trucking

5    company, do you know why?

6    A.   Yeah, because he said that they wasn't paying him nothing,

7    they was running him around and wasn't paying him, you know, no

8    money, like 200 and all that, you know.

9    Q.   Okay.  And after he left the trucking company, was he able

10   to find new employment, immediately?

11   A.   No.

12   Q.   All right.  Was he looking for employment?

13   A.   Yes.

14   Q.   Okay.  With respect to the situation with the employment,

15   did that cause some hardship even in your household?

16   A.   Yes.

17   Q.   Were you depending on your son to help you with the

18   expenses of the home?

19   A.   Yeah, because he come by one day and he told them that the

20   water was off and he had to pay the water bill.  He showed him

21   the water was off and different stuff.  So, I ain't heard no

22   more from him, but that -- it's --

23   Q.   Okay.  And with respect to your son, in terms of

24   restitution; did you try, after he was arrested, to talk to

25   Mr. Manuel about paying some of the restitution?

1    A.    Yes.

2    Q.    All right.  And in fact, did your family --

3    A.    I asked him -- I asked three times could I pay him, could

4    I, you know, well, I asked him three times what could I do.  He

5    said, "Nothing."

6    Q.    Okay.  In fact, did your family at some point try to raise

7    funds so that you could try to address this --

8    A.    Yeah.

9    Q.    -- issue of restitution?

10   A.    Right.

11   Q.    And in fact, did you make a payment against your son's

12   restitution, recently?

13   A.    Yeah.

14   Q.    Okay.  How much did you pay?

15   A.    Eight hundred.

16   Q.    Okay.

17            MR. CHANEY:  I have no further questions with respect

18   to Ms. Graves, Your Honor.

19            MR. KAMMER:  Your Honor, the Government doesn't have

20   any questions for Ms. Graves.

21            THE COURT:  All right.  Thank you, ma'am.  Step

22   down.

23       (Witness is excused)

24            MR. CHANEY:  Your Honor, I call Michael Graves.

25            THE COURT:  Mr. Graves.

1                          *    *    *    *    *

2              **MICHAEL GRAVES, DEFENDANT, SWORN**

3                          *    *    *    *    *

4                        DIRECT EXAMINATION

5    BY MR. CHANEY:

6    Q.   Mr. Graves, how long have you been on supervised release?

7    A.   Since December of 2003.

8    Q.   Okay.  And has Mr. Cornell Manuel supervised you since the

9    time for the entire period that you've been on supervised

10   release?

11   A.   Yes.

12   Q.   All right.  During the time that you've been on supervised

13   release, did you have a schedule by which you would have filed

14   reports with Mr. Manuel?

15   A.   Yes.

16   Q.   Okay.  And did you comply with the schedule with respect

17   to the filing of those reports?

18   A.   As the best of my ability at the time, yes.

19   Q.   When you say the best of your ability; were there some

20   times when you were late in getting reports into Mr. Manuel?

21   A.   Yes.

22   Q.   All right.  And when you were late, did you contact

23   Mr. Manuel to explain to him that you were going to be late in

24   filing?

25   A.   Yes.

1   Q.   Can you tell the Court what caused you to be late

2   sometimes in filing reports?

3   A.   Sometimes you, like I would be in different parts of the

4   country and with the mail system and different things like that

5   and I would just fall behind.

6   Q.   Okay.  Now, you said different parts of the country; what

7   was taking you to different parts of the country?

8   A.   My job.

9   Q.   And where were you working?

10  A.   First I was working for Landstar Inway.

11  Q.   What is that?

12  A.   A trucking company.

13  Q.   Doing what?

14  A.   Driving a truck.

15  Q.   And what routes were you driving or where?

16  A.   It was the irregular route carrier.  It wasn't no set

17  place that you go back and forth.

18  Q.   How much were you making?

19  A.   At that point probably about $1,600 a month.

20  Q.   And that $1,600; was that gross or net?

21  A.   That was gross.

22  Q.   Okay.  And from the $1,600 that you were making, did you

23  have expenses that you have to address with respect to your

24  household?

25  A.   Right.

1  Q.   Okay.

2  A.   Yes.

3  Q.   And did you talk with Mr. Manuel about your employment

4  situation?

5  A.   Yes, I did.  He knew fully about my situation.  When I

6  first was on supervised release I was working for the Sheriff's

7  Department, but that was only $6 an hour and I couldn't make

8  it, you know.

9  Q.   And was an adjustment made to the $250 that you were

10 required to pay in restitution to an amount that you could

11 afford?

12 A.   No.

13 Q.   Okay.  Were you doing your best to make -- meet the $250

14 payment?

15 A.   Right.  Yes, I was.

16 Q.   Okay.  After you left the Sheriff's Department, you said

17 you worked for Inway?

18 A.   Landstar Inway.

19 Q.   And then the next company you worked for was what?

20 A.   Doak Transportation.

21 Q.   And where is Doak located?

22 A.   Las Cruces, New Mexico.

23 Q.   Okay.  When did you begin working with Doak?

24 A.   The last part of November, 2004.

25 Q.   Okay.  When you left Inway and went to Doak; how much --

1  was there a change in your income?

2  A.    At first there was, but then it started dwindling.

3  Q.    Okay.  What was the -- what were you making at Doak?

4  A.    About $1,800 a month.

5  Q.    And that $1,800; was it based on hours worked or miles

6  driven, or assignments taken?  How was it --

7  A.    It's a percentage.  You get 20 percent of what the gross

8  of the load pays.

9  Q.    Okay.  When you were working with Doak; how many days a

10  week were you working?

11  A.    Seven.

12  Q.    And when you worked with Doak, were there times when you

13  worked beyond -- I mean worked for extended periods away from

14  New Orleans?

15  A.    Absolutely, yes.

16  Q.    Did you communicate to Mr. Manuel that your job would take

17  you away from New Orleans for extended periods?

18  A.    Yes, he even talked to my employer.

19  Q.    Okay.  And was an accommodation made?

20  A.    Yes, he told me not to worry about the visits, coming in,

21  just make sure the reports were there.

22  Q.    Okay.  And when he said --

23        THE COURT:  Wait.  Hold on.  Let's get this straight.

24  Mr. Manuel the probation officer told you that you did not have

25  to come to report to the probation office at any time, as long

1   as you got your written reports in?

2          THE WITNESS:  No, not at any time.

3          THE COURT:  But that's what your lawyer asked and you

4   said yes.

5          THE WITNESS:  Well, the provision --

6          THE COURT:  Which is it?  Yes or no?

7          THE WITNESS:  Well, the provision --

8          THE COURT:  Yes or no?

9          THE WITNESS:  Yes.  I had to report but not when I

10  was out on the road.  When I was on the road, it was -- I

11  didn't have to report.  When I came in --

12         THE COURT:  So, those dates that's alleged in the

13  petition where you didn't report; are you saying that

14  Mr. Manuel gave you permission not to come in on those dates?

15         THE WITNESS:  Right.  Those are the dates that I was

16  on the road.  If I'm in Seattle, it's kind of hard to come, you

17  know, to New Orleans for a probation visit.

18         THE COURT:  You're on supervised release.  You don't

19  determine, because of your job, when you have to report.

20         THE WITNESS:  Yes, sir, I understand that.

21         THE COURT:  I determine that and probation enforces

22  that.

23         THE WITNESS:  Yes, sir.

24         THE COURT:  I don't care where you are, as long as

25  you report.

Michael Graves - Direct                                    37

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Did you report those days?

3          THE WITNESS:  I called him on the phone.

4          THE COURT:  Did you report those days?

5          THE WITNESS:  No, sir.

6   BY MR. CHANEY:

7   Q.   On the days that you knew that you were not going to be

8   able to get back, or in advance of that; would you communicate

9   to Mr. Manuel that you were still on the road and that you

10  needed an accommodation?

11  A.   Yes.

12  Q.   And his accommodation was for you to call?

13  A.   To call in and let him know and when I got back in, to

14  report.

15  Q.   And he told you when you got back in to New Orleans that

16  you needed to come and see him?

17  A.   Right.

18  Q.   And did you do that?

19  A.   Yes.

20  Q.   Okay.

21          THE COURT:  Now, where Mr. Manuel says that you did

22  not contact him and explain to him why you did not make those

23  appointments as alleged in the petition; you're telling me that

24  he is wrong?

25          THE WITNESS:  Yes, sir.  He even, if I may --

1          THE COURT:  Who were you working for in May of 2004?

2          THE WITNESS:  Doak Transport.

3          THE COURT:  Spell it.

4          THE WITNESS:  D-O-A-K.

5          THE COURT:  D-O-A --

6          THE WITNESS:  A-K Transport.

7          THE COURT:  "K"?

8          THE WITNESS:  Yes, Transportation.

9          THE COURT:  And where are they located?

10         THE WITNESS:  Las Cruces, New Mexico.

11         THE COURT:  Do they have a local contact?

12         THE WITNESS:  No, sir.

13         THE COURT:  Who was your contact with them in Las

14   Cruces?

15         THE WITNESS:  Jesse Oliver.

16         THE COURT:  Probation has a number for this employer?

17         THE WITNESS:  It's 800 --

18         THE COURT:  No, I'm asking probation.  Ms. Williams?

19         MS. WILLIAMS:  For the Doak's employment?

20         THE COURT:  Yes.

21         MS. WILLIAMS:  Yes, Your Honor.

22         THE COURT:  You do?

23         MS. WILLIAMS:  Yes, I do.

24         THE COURT:  All right.

25         MS. WILLIAMS:  It's 1-800 --

1          THE COURT:  And who were you working for, Mr. Graves,

2   in November of 2004?

3          THE WITNESS:  November of 2004, I wasn't -- I hadn't

4   yet taken the job with Doak.  I was waiting to be approved.

5          THE COURT:  Then why didn't you report on that date,

6   November 15, 2004?

7          THE WITNESS:  Well, he had -- Mr. Manuel had called

8   me, I was in the hospital.  My glands had swollen in my throat

9   and I couldn't talk, I couldn't swallow, or anything.

10          THE COURT:  What hospital?

11          THE WITNESS:  Touro.

12          THE COURT:  When?

13          THE WITNESS:  November 24th or something.  I can't

14   exactly remember the exact date.

15          THE COURT:  I'm talking about November 15.

16          THE WITNESS:  Yeah, that was -- that was around that

17   time.

18          THE COURT:  Now, I want to know were you in the

19   hospital on November 15th?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Touro Hospital, November 15, glands

22   swelling; you were there overnight?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Not outpatient?

25          THE WITNESS:  No, sir.

Michael Graves - Direct                          40

1              THE COURT:  Who was your doctor?

2              THE WITNESS:  I don't remember the doctor's name,

3    sir.

4              THE COURT:  All right.  April 1, 2005; were you

5    working?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  With?

8              THE WITNESS:  Doak Transportation.

9              THE COURT:  Where were you on that date?

10             THE WITNESS:  I can't exactly remember, probably in

11   Texas because most of the routes ran from California going

12   anywhere else, but it was probably in Texas.

13             THE COURT:  April 4, 2005; where were you?

14             THE WITNESS:  Probably still in Texas, Your Honor.

15             THE COURT:  April 29, 2005?

16             THE WITNESS:  Probably still in Texas -- well, not in

17   Texas but I don't exactly remember where, because I quit around

18   May -- somewhere within the first week of May, I quit.  That's

19   when he came to the house and saw my mom's water was off.

20             THE COURT:  All right.  I'm interested in April 29th,

21   2005.

22             THE WITNESS:  I don't remember exactly where I was.

23   I know I was employed though, at that time.

24             THE COURT:  All right.  Mr. Graves, you need to be

25   careful.  I'm asking you specifically about those particular

1    dates because those are the dates alleged in the report where

2    Mr. Manuel says you failed to report for your scheduled

3    appointments with probation.

4              THE WITNESS:  Yes, sir.

5              THE COURT:  Are you certain about the testimony you

6    just gave me?

7              THE WITNESS:  Yes, sir, and --

8              THE COURT:  And you understand that you're under oath

9    now.  If you're lying to me right now, and if the Government

10   proves that you're lying to me, you face additional penalties

11   up to maybe five years in jail, in addition to what you're

12   facing now.  Are you certain that those are the correct

13   answers?

14             THE WITNESS:  Yes, sir.  My lawyer even contacted my

15   employer to get the rest of my records.  My mom --

16             THE COURT:  I'm not asking about what your lawyer

17   did.  Don't blame him.

18             THE WITNESS:  No.

19             THE COURT:  If whatever he did was wrong.  I'm asking

20   you.

21             THE WITNESS:  Yes, sir.  I was employed.

22             THE COURT:  No, not -- I know you were employed at

23   certain points.

24             THE WITNESS:  Yes.

25             THE COURT:  I want to know the answers that you just

Michael Graves - Direct                                    42

1    gave me for those specific dates; were those truthful answers?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Okay.  All right, Mr. Chaney.

4    BY MR. CHANEY:

5    Q.   Mr. Graves, after the problems arose in April, or arose in

6    April with you not being on the road; did you have a

7    conversation with Mr. Manuel regarding your employment, and the

8    change of employment?

9    A.   Right.  The day I came home, I don't exactly remember what

10   day it was, but he came by that morning and I was cleaning Doak

11   Transportation's truck.  I was, you know, I was getting all of

12   my personal belongings out of the truck so they could come get

13   it.  He came to the house and he asked me what I was doing and

14   I told him I had just quit my job.  I was just cleaning my

15   truck out.  And he was like, "Well, you need to make a

16   restitution payment."

17         And I was like -- I turned the faucet on outside and I was

18   like, "You see, my mom's water off.  I mean, what do you want

19   me to do?"

20   Q.   Okay.

21   A.   You know?

22   Q.   With respect to the issue of the job though.

23   A.   Right.

24   Q.   You changed your job, or did you change your job so that

25   you could be here to make appointments or begin to looking for

1   -- look for a new job so you could be here to make office

2   visits?

3   A.   Right, yes sir.

4   Q.   Okay.  And with respect to the April dates that you

5   missed; can you describe for the Court what happened or what

6   was happening that you were not able to get back to New Orleans

7   for your office visits?

8   A.   Well --

9        THE COURT:  He said that on April 1 he was in Texas;

10  on April 4 he was in Texas; and that on April 29 he's not

11  certain.

12       MR. CHANEY:  All right.

13  BY MR. CHANEY:

14  Q.   Specifically, if you were to leave a load from your

15  company out on the road to come back to New Orleans; what

16  consequence would that have on you as an employee and on you as

17  a driver for any other company?

18  A.   I couldn't get another job driving, because you would --

19  they have what's called a DAK (phonetic) report and everything

20  you do as a driver for companies that subscribe to DAK is

21  reported to DAK and they use that kind of as a background

22  check, to see if --

23  Q.   All right.  And if you abandon a load, --

24  A.   If you --

25  Q.   -- would you be able to find employment as a truck driver

Michael Graves - Direct                                        44

1   even doing local trucking stuff?

2   A.    No.

3   Q.    Okay.  And was that a concern for you about abandoning a

4   load so that you could be in town to meet your meetings or to

5   make the meetings?

6   A.    Yes.

7   Q.    Did you communicate that to Mr. Manuel?

8   A.    Yes, I've talked to him numerous amounts of times on the

9   phone and told him.  He was in contact with my employers.  I

10  would ask him, "Have you talked to them?"

11        And he would be like, "Yes, I have."

12  Q.    Okay.

13  A.    "Now well, then you see the position I'm in, I'm in like a

14  rock and a hard place," because I would communicate to them

15  that I needed to get home and they would like not really hear

16  me or, you know, "Well, this load's got to get there."

17        So, when I would get home, like one day for Christmas, I

18  came home Christmas night and had to leave Christmas night,

19  because I needed to be in Atlanta the next morning.

20  Q.    All right.

21  A.    And you know, they just -- that was another factor why I

22  quit, because they just wasn't concerned about me, it was just

23  more about the truck.

24  Q.    Okay.  Now, after you left Doak, did you in fact talk with

25  family members, or a family member locally, about working with

1    them at a contracting company?

2    A.    Yes.

3    Q.    And, in fact, were you trying to get things in order so

4    that you could begin working?

5    A.    Yes.

6    Q.    All right.   What happened?

7    A.    We were working on some things to get -- they were waiting

8    on some houses to be framed up and slabs to be poured and

9    carpenters to get finished, because the type of work that they

10   do is brick laying.   So, I had a job as soon as that was ready

11   to go.

12   Q.    Okay.   In the interim, were you arrested?

13   A.    Yes.

14   Q.    Okay.   Had you spoken with Mr. Manuel about the fact that

15   you had employment lined up that you were waiting for the house

16   to be completed to the stage where you could begin to work?

17   A.    Yes.

18   Q.    Okay.   And with respect to that employment, is that

19   employment still available?

20   A.    Yes.

21   Q.    Okay.   Now Mr. Graves, I'm going to show you what the

22   Government offered or the Government presented and the Court

23   has issued into the record as Court Exhibit 1.   I'm going to

24   show you this.

25   A.    (Witness examines document.)

Michael Graves - Direct                    46

1   Q.    Have you ever seen this document before?

2   A.    This is my first time seeing this.

3   Q.    Okay.

4           MR. CHANEY:    Just for the record, Your Honor, this is

5   a copy of the Worthless Check Partial Payment.

6           THE COURT:    I've got it.

7   BY MR. CHANEY:

8   Q.    There is a place where it says "M-R," and then there's the

9   name.   Did you write that name in there?

10  A.    No.

11  Q.    Were you present when this name was written in there?

12  A.    No.

13  Q.    And with respect to the issue of the signatory to this;

14  did you have any communications with Ms. Elnora Alston about

15  this agreement?

16  A.    No.

17  Q.    Okay.   Now Mr. Graves, with respect to the issue of

18  restitution, why was it that you were not able to make

19  restitution payments on the schedule that was ordered by

20  Pretrial -- by probation?

21  A.    Well, like I said, when I first came home, when I first

22  was released on supervised release I was working for the

23  Sheriff's Department in the Mechanics Shop, but that's only $6

24  an hour, getting paid biweekly, so it adds up to maybe $300 and

25  something every two weeks, because you really don't work that

 1   much.

 2   Q.   And how much expenses -- how much were you responsible for

 3   in connection with your house or your mother's house where you

 4   were living?

 5   A.   At least half.

 6   Q.   Okay.

 7   A.   At least half.

 8   Q.   And after you left the Sheriff's Department and began

 9   working, were you able to address those restitution payments a

10   little better?

11   A.   Right.

12   Q.   Okay.

13   A.   Yes.

14   Q.   And in fact, were you trying to get on a regular schedule

15   and make those restitution payments as ordered?

16   A.   Yes.

17   Q.   Okay.  When you left Inland --

18   A.   Inway?

19   Q.   Inway, rather.

20   A.   Right.

21   Q.   Was there a change in your income such that it affected

22   your ability to pay it again?

23   A.   Yes.

24   Q.   And what, if anything, did you do to try to make payments

25   as required on your restitution?

1   A.   I tried to make the payments as best of my ability at that

2   time.  I mean, I did -- borrowed money, or whatever, and just

3   tried to make my payments.

4   Q.   Okay.  And there were times you did fall back -- fall

5   behind in your restitution payment?

6   A.   Yes.

7   Q.   And with respect to the reports that you were required?

8   A.   Yes.

9   Q.   Those reports are to be submitted every month?

10  A.   Yes.

11  Q.   Okay.  And they are at least to be submitted by a specific

12  date of the month?

13  A.   Yes.

14  Q.   Okay.  Do you know the specific dates or the specific

15  months when you were late submitting reports to Mr. Manuel?

16  A.   No.  I don't know the specific --

17  Q.   Do you remember how many times that occurred?

18  A.   Maybe twice.  Twice.  I probably fell behind with the

19  reports probably twice.

20  Q.   Okay.  And were you arrested -- since the time you were

21  released on supervised release until the time you were arrested

22  in connection with the warrant issued by Mr. Manuel; had you

23  been arrested by any authority, policy authority?

24  A.   No.

25  Q.   Had any new charges been brought against you by any police

1  authority?

2  A.    No.

3  Q.    Okay.  Did you have a relationship with an individual

4  named Ms. Taplin?

5  A.    Yes.

6  Q.    And that relationship ended?

7  A.    Yes.

8  Q.    And after the relationship ended, did she communicate to

9  you that she was going to get you put in jail or call your

10  probation officer or --

11  A.    No.

12  Q.    All right.  Did she communicate to you that she believed

13  that you owed her some money in connection with anything?

14  A.    No.

15  Q.    Okay.  Did she ever make a demand or request from you,

16  money for anything?

17  A.    No.

18  Q.    Okay.  A Ms. Brown?

19  A.    As for what, the same question?

20  Q.    Christy Brown.

21  A.    The same question?

22  Q.    Did you have a relationship with her?

23  A.    Yes.

24  Q.    And was there any time at which you pawned any ring or --

25  A.    Oh, me and Ms. Brown -- let me see, how can I put this?

1         THE COURT:  Put it truthfully, Mr. Graves.

2         THE WITNESS:  Yes, sir.  Ms. Brown and I had a

3   relationship.  Ms. Brown wanted to take it to another level and

4   get married, so Ms. Brown bought a set of rings.  So, she gave

5   me the rings, okay, and when she gave them to me, I was just

6   telling her:  Hey, I don't want to get married right now.  I

7   can't.  I can't get married because I found out some things

8   about her past that she didn't tell me.

9   BY MR. CHANEY:

10  Q.   Okay.

11  A.   And --

12  Q.   Now, the rings; were they rings -- was it just a man's

13  ring she bought for you?

14  A.   No.

15  Q.   Or was it a --

16  A.   It was a bridal set.

17  Q.   Okay.

18  A.   She purchased the bridal set, and when she purchased it,

19  she was like:  Well, here, you keep it, you think about it.

20  But during that time is when my restitution, Mr. Manuel was

21  getting on me about my restitution and all of that, so that's

22  what happened with that.

23  Q.   Okay.  Now, when she gave you the rings; what was -- I

24  mean, was she trying to set a date for the two of you to get

25  married?

1  A.   No, not right at that moment, just we going be engaged or

2  whatever.

3  Q.   But that was her way of saying:  I want us to have a

4  permanent relationship?

5  A.   Right.

6  Q.   And when you told her that you did not want that, what

7  happened?

8  A.   Well, everything just fell apart.

9  Q.   Okay.  With respect to the ring in question?

10 A.   Right.  Well, before -- before, when she gave me the

11 rings, I mean, this is like some time after that, you know, we

12 were still discussing this.

13 Q.   Uh-huh.

14 A.   So, you know, Mr. Manuel was on me about my restitution

15 and so I did go to the pawn shop and I did, you know.

16 Q.   You pawned the ring?

17 A.   Yes.

18 Q.   And you took the money that you got from the pawn --

19 A.   Right.

20 Q.   -- and paid down a part of the restitution?

21 A.   Right.

22 Q.   Okay.  And with respect to the rings; were the rings, to

23 your knowledge, stolen rings?

24 A.   No, they weren't stolen.

25 Q.   I mean, was there -- the rings; they were in your custody

1    and did you believe that you could pawn them and get the money

2    and then just go back and get the pawn back with --

3    A.    Right.  That was the -- that was the idea.

4    Q.    Did that happen?

5    A.    No, not at this point.

6    Q.    All right.  You were not able to go back and get the rings

7    back?

8    A.    Right.

9    Q.    Was that a source of anger between you and Ms. Brown?

10   A.    Ms. Brown -- what happened with Ms. Brown, Ms. Brown had a

11   slight mental problem that I wasn't aware of and it was an

12   anger control type problem, and that's really one of the

13   reasons why we couldn't be together.  I found out all of this.

14   Q.    All right.

15   A.    After the fact.

16   Q.    But you told Ms. Brown that you had pawned the rings so

17   that you could address this issue, the restitution?

18   A.    Yes.

19   Q.    And that angered Ms. Brown?

20   A.    Yes.  The fact that we weren't going to be together

21   angered her more --

22   Q.    Okay.

23   A.    -- than the ring situation.

24   Q.    Okay.  And at any point did she tell you that she was

25   going to call the police and tell them that you had taken those

1   rings from her?

2   A.   No.

3   Q.   At any point were you aware that any report had been made

4   that those rings had been stolen?

5   A.   No, they were never stolen.

6   Q.   Okay.  And when the rings came into your possession, it

7   was her giving you the rings?

8   A.   Yes.

9            MR. CHANEY:  I have nothing further with respect to

10  this witness, Your Honor.

11           THE COURT:  Mr. Graves, did you ever give Ms. Brown

12  any checks or, to your knowledge, did she deposit any checks

13  that you gave her?

14           THE WITNESS:  No, sir.

15           THE COURT:  You didn't direct her to deposit any

16  checks that later came back insufficient?

17           THE WITNESS:  No, sir.

18           THE COURT:  And none of these checks were written by

19  you?

20           THE WITNESS:  No, sir.

21           THE COURT:  Did you direct Ms. Brown to purchase this

22  -- some sort of Dodge vehicle?

23           THE WITNESS:  No, sir.

24           THE COURT:  What about Ms. Taplin, to purchase a

25  Corvette?

1          THE WITNESS:  No -- me and Ms. Taplin were in a

2    relationship.  Ms. Taplin -- we actually started a record label

3    together and so we were more like in a relationship and

4    business partners.  So, when me and Ms. Taplin -- when things

5    started going bad with Ms. Taplin, that's when, you know, I

6    just canceled the business and was like:  Well, I really don't

7    want to be involved with this with you either, and we kind of

8    like let things go.

9          And this, you know, as far as her with this, I don't

10   -- I didn't -- this is the first time, you know, that I'm aware

11   of any charges or anything, because --

12         THE COURT:  So, you didn't direct Ms. Taplin to

13   deposit checks in order to buy a Corvette and a Dodge Magnum

14   and some sort of Nissan Armada?

15         THE WITNESS:  No, sir.  Ms. Taplin bought those

16   vehicles on her own.  I didn't write any checks for those

17   vehicles.  I didn't instruct any -- my name was nowhere near

18   anything on those vehicles.  I didn't -- Ms. Taplin, you know,

19   from my understanding was just trying to show me what she could

20   do for me if I wanted to be with her.

21         THE COURT:  Did you ask her to do these things?

22         THE WITNESS:  No, sir.

23         THE COURT:  Did you instruct her how to do these

24   things?

25         THE WITNESS:  No, sir.

Michael Graves - Direct                    55

1          THE COURT:  Did you go with her to the dealerships at

2    any time?

3          THE WITNESS:  She told me to go with her, you know,

4    she was buying a car, and that was -- as far as I know, she was

5    buying a car.

6          THE COURT:  This worthless check partial payment

7    contract that your attorney showed you and that we referenced

8    earlier; it supposedly involves a worthless check written to

9    Ms. Taplin either from you or involving you is what the

10   implication of this contract is.  So, you're saying that you

11   know nothing about the circumstances surrounding this contract?

12         THE WITNESS:  I didn't give Ms. Taplin any checks to

13   buy a car.  I didn't give Ms. Taplin any money to do anything

14   with on that level.

15         THE COURT:  You never gave her any worthless checks?

16         THE WITNESS:  I never gave her a worthless check,

17   Your Honor.  What happened, me and Ms. Taplin and another guy

18   were on the same checking account, the business account.  I

19   didn't give Ms. Taplin a check to do anything with.  Ms. Taplin

20   had access to the checks as well as everyone else in the

21   business, which would be us three, but she had access to

22   everything just like we all did.

23         THE COURT:  Did the DA's Office contact you about

24   this situation?

25         THE WITNESS:  The DA's Office, to my knowledge, when

Michael Graves - Direct                                    56

1    I was out of town, sent a letter to the house and my mom got

2    the letter, called me on the phone and told me about it.  Then,

3    that was pretty much the last I heard about it.  I told the

4    lady that, you know, I wasn't -- I didn't write any checks or

5    anything like that as far as --

6              THE COURT:  You told what lady?

7              THE WITNESS:  The lady -- the clerk that answered the

8    phone.  I told her I didn't know anything about any of that.

9              THE COURT:  Do you know the person's name?

10             THE WITNESS:  No, sir.

11             THE COURT:  This is in the DA's Office?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  You gave the person your name?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  When did you make this phone call?

16             THE WITNESS:  I don't exactly remember, Your Honor.

17             THE COURT:  Was it in May of 2005?

18             THE WITNESS:  No, it wasn't in May.

19             THE COURT:  Before?

20             THE WITNESS:  I think it was, Your Honor.

21             THE COURT:  Who is Elnora Alston?

22             THE WITNESS:  Oh, that's a girlfriend.

23             THE COURT:  Did you give her any money to go and make

24   a payment and sign this contract for you?

25             THE WITNESS:  No, sir.

 1          THE COURT:  Did you know she did that?

 2          THE WITNESS:  No, sir.

 3          THE COURT:  Did you instruct her in any way to do

 4  that?

 5          THE WITNESS:  No, sir.

 6          THE COURT:  Does she have a mental problem, too?

 7          THE WITNESS:  Who?

 8          THE COURT:  Ms. Alston.

 9          THE WITNESS:  No, sir.

10          THE COURT:  So, she just went down and gave them

11  $250, signed her name to a contract, obligating you and her to

12  a balance of $4,280 -- I'm sorry, 40 -- yeah, $4,200 or $4,400,

13  $4,500?

14          THE WITNESS:  Your Honor, I know this probably has no

15  relevance to what you're asking me but Ms. Taplin is not a very

16  -- what you --

17          THE COURT:  I'm not asking you about Ms. Taplin, I'm

18  asking you about Ms. Alston.

19          THE WITNESS:  I guess if she did that, she was

20  probably trying to look out for my best interests.

21          THE COURT:  And you knew nothing about that?

22          THE WITNESS:  I had no -- I had no contact with, you

23  know, anything like that.

24          THE COURT:  All right.  Cross?

25          MR. KAMMER:  Yes, Your Honor.

1                           *    *    *    *    *

2                         CROSS-EXAMINATION

3   BY MR. KAMMER:

4   Q.    I would like to talk about the bridal set.  Who was it

5   that -- the rings that were bought; who was that bought by?

6   A.    Ms. Brown.

7   Q.    "Ms. Brown."  Now, she just went out and bought her own

8   bridal set, correct, and then gave it to you?

9   A.    Yes, sir.

10  Q.    And that's correct?  And then, you took it and you did

11  pawn it; we do agree on that, correct?

12  A.    Yes, sir.

13  Q.    Okay.  And how much did you pawn it for?

14  A.    Right around 400 bucks.

15  Q.    Right around $400?

16          MR. KAMMER:  Your Honor, I'm going to show the -- I

17  guess the first one was marked as Court Exhibit 1, I'll make

18  this Government Exhibit 1.  I have shown this to Counsel

19  already.

20  BY MR. KAMMER:

21  Q.    Do you recognize this document, Mr. Graves?

22  A.    (Witness examines document.)  Yes.

23  Q.    Okay.  Is this the pawn receipt ticket that you signed for

24  when you pawned the ring?

25  A.    Pretty much.

1  Q.   Is that your signature there (indicating)?

2  A.   Yes.

3          MR. KAMMER:  Your Honor, I'm also going to show him

4  what will be Government Exhibit Number 2.  I have shown this to

5  Counsel, as well.

6  BY MR. KAMMER:

7  Q.   Do you recognize this, Mr. Graves?

8  A.   (Witness examines document.)  Yeah, that's one of the

9  checks from my business account.

10 Q.   How much is that check for?

11 A.   $4,280.

12 Q.   Who is it made out to?

13 A.   Tamara Taplin.

14 Q.   And who signed it?

15 A.   It looks like it could be my name.

16 Q.   And what does it say in big letters here, across the

17 check?

18 A.   Insufficient funds.

19         MR. KAMMER:  Your Honor, I would like to introduce

20 these into the record and tender them to the Court at this

21 time.

22         THE COURT:  I'll leave it open for cross before I

23 rule -- I mean direct.

24         MR. KAMMER:  Thank you, Your Honor.

25         THE COURT:  You identified that as what, Government

1  1?

2         MR. KAMMER:  Government 1 and 2.  Your Honor, do we

3  have a copy of the Court Exhibit 1, the contract that I could

4  look at?

5         MR. CHANEY:  Here it is (indicating).  Use this one.

6         THE CLERK:  Yes, here is one.

7         MR. CHANEY:  There may be one for you over there,

8  okay.

9         MR. KAMMER:  Okay, thank you.

10  BY MR. KAMMER:

11  Q.   Now Mr. Graves, you said that you had not seen this

12  contract, correct?

13  A.   Right.

14  Q.   What is the amount on this contract?

15  A.   $4,280.

16  Q.   And it's the same amount as this record, that's on this

17  check that was written to Ms. Taplin, correct?

18  A.   Right.

19  Q.   And signed by you, correct?

20  A.   Right.

21  Q.   Didn't you just tell the Court that you had never signed a

22  check over to Ms. Taplin --

23  A.   I did --

24  Q.   -- that was returned for insufficient funds?

25  A.   I -- I told you, that's what I said.

Michael Graves - Cross                    61

1  Q.   But that's not what that document, Government 2, looks

2  like?

3  A.   But that's not my signature.

4  Q.   Well, you just said it was your signature, it looked like

5  your signature.

6  A.   No.  No, I didn't.  I said it looked like my signature.  I

7  didn't tell you it was my signature.

8  Q.   Now, you would have us believe that your girlfriend,

9  Ms. Alston, just found out about this need by the DA's Office

10 on her own and went down there and volunteered on this

11 contract?

12       THE COURT:  Counselor, move on to something else.  We

13 went over that.

14       MR. KAMMER:  Thank you, Your Honor.

15 BY MR. KAMMER:

16 Q.   You've talked earlier about the amount of money that you

17 made at Doak Transportation.  How much was that per month?

18 A.   It started off as being $1,800 and then it dwindled.

19 Q.   Okay.  But during that time when you were there, when it

20 was $1,800; didn't you tell the probation office that your

21 monthly expenses were $1,600?

22 A.   Pretty much, yes.

23 Q.   So, that would leave you $200 left over every month,

24 correct?

25 A.   Pretty much.

1   Q.   Did you send that to probation?

2   A.   No.

3   Q.   Did you use that for restitution?

4   A.   No, because Mr. Manuel -- he didn't tell me that I could

5   send $20.  He didn't tell me that up until the time when he

6   came to the house and saw the water was off.

7   Q.   You worked at a --

8   A.   That's when he --

9   Q.   I'm sorry, go ahead.

10  A.   That's when he told me, "Well, you know, you can send $20,

11  $30 or $10, whatever you have."

12  Q.   When you looked at -- when you worked at -- is it

13  Landstar?

14  A.   Landstar Inway.

15  Q.   How much did you make when you were at Landstar?

16  A.   Approximately $1,600 a month.

17  Q.   Didn't you tell the probation office that it was $3,200 a

18  month?

19  A.   Thirty-two?

20  Q.   $3,200 a month, correct.

21  A.   Not to my knowledge.

22  Q.   Do you remember signing reports?

23  A.   Yes.

24  Q.   With them, telling them how much money you were making at

25  different employment?

Michael Graves - Cross                                    63

1   A.   Yes.

2   Q.   Do you remember how much you told probation your living

3   expenses were at that time?

4   A.   I don't -- I don't remember.

5   Q.   How about $2,750, $2,750 a month?

6   A.   Well, some months yeah, because some months things just

7   overlap and overlap like our water bill was like $600, $700.

8   Our phone bill was like 500 and some dollars.  Our rent was

9   like 800 and some dollars.  Light bill was like 400 and some

10  dollars, you know.

11  Q.   Okay.  I would like to also ask you about a couple of

12  dates.  First of all, the April 4th, 2005 date you were

13  supposed to report to the probation office?

14  A.   Right.

15  Q.   Do you remember discussing that with Mr. Chaney?

16  A.   Yes.

17  Q.   Okay.  Didn't you call the probation office on March 31st,

18  2005 and tell them that you were out of town and couldn't make

19  it in town?

20  A.   Yes.

21  Q.   What did Mr. Cornell tell you at that time, Mr. Manuel?

22  A.   He told me I need to be in his office.

23  Q.   On April the 4th, 2005, correct?

24  A.   And I told him that I doubted if I could get there.  I

25  would try my best and let my employer know, but I doubted if I

Michael Graves - Cross                          64

1  could be there.

2  Q.    That's not what you told your Counsel?

3  A.    Yeah.

4  Q.    When your Counsel was questioning you?

5  A.    That's what I told him.

6  Q.    Also, on April 20th, 2005, do you ever remember your

7  employer telling you that the probation office was looking for

8  you?

9  A.    My employer never told me that.  I know that Mr. Manuel

10 had talked to the probation officer because he had told me that

11 he did.

12 Q.    One more question:  You said -- you stated when the Judge

13 was questioning you that you received a letter.  You received

14 some letter that notified you that you were -- something was

15 going on at the DA's Office, correct?

16 A.    Right.

17 Q.    And you said you called the DA's Office?

18 A.    I called them.  I don't remember who I spoke with.

19 Q.    Did you ever call probation and tell them about that

20 situation?

21 A.    No, I didn't think that I had to.

22          MR. KAMMER:  No more questions, Your Honor.

23          THE COURT:  You recall, Mr. Graves, that you stated

24 you got on supervised release December 23rd, 2003.  When was

25 the first time that you made a restitution payment?

1          THE WITNESS:  I'm not -- I don't remember,

2     Your Honor.

3          THE COURT:  Was it in early 2004, late 2004?

4          THE WITNESS:  It was early.  It should have been

5     early.

6          THE COURT:  Does probation have a record of the first

7     payment?

8          MS. WILLIAMS:  Yes, Your Honor.  Yes, Your Honor.

9     The first payment was made on March 19th, '04 in the amount of

10    $350.

11         THE COURT:  Do you recall when the next payment was,

12    Mr. Graves?

13         THE WITNESS:  No, sir.  It probably --

14         THE COURT:  Probation?

15         THE WITNESS:  It probably was later in the -- in the

16    year.

17         MS. WILLIAMS:  Your Honor, it was October 29th, '04,

18    in the amount of $100.

19         THE COURT:  And then, do you recall the next payment

20    after that, Mr. Graves?

21         THE WITNESS:  No, sir.

22         THE COURT:  Would it have been in 2005?

23         THE WITNESS:  Yeah, I think that might have been the

24    payment my mom made.

25         THE COURT:  The $800?

 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  Probation?

 3              MS. WILLIAMS:  Yes, Your Honor.  It was 7/18/05 of

 4     $800.

 5              THE COURT:  Seven what?

 6              MS. WILLIAMS:  It was 7/18.

 7              THE COURT:  A few days ago?

 8              MS. WILLIAMS:  Yes.

 9              THE COURT:  $800?

10              MS. WILLIAMS:  Yes.

11              THE WITNESS:  Your Honor, if I may?

12              THE COURT:  Go ahead.

13              THE WITNESS:  Me and my mom, the place where we live,

14     we're getting a big lawsuit at the 1st of August, and that's

15     what we are depending on and we have told Mr. Manuel about

16     that, constantly.  And I told him that, you know, when the

17     lawsuit pays off at the 1st of August that I was going to at

18     least pay half of my restitution down.  And I have told him, my

19     mom told him, you know, we have told him that.

20              THE COURT:  When did he come out there and, as you

21     say, see that your mom's water was cut off?

22              THE WITNESS:  That was in May.

23              THE COURT:  Of 2005?

24              THE WITNESS:  Yeah.  Yes, sir.

25              THE COURT:  And it wasn't until then that you found

 1  out you could make a lower payment than $250 a month?

 2          THE WITNESS:  Well, that's when -- that's when he

 3  said that, "Well, so you can pay $20 or $10."

 4          And I was like, "Well, you didn't tell me that

 5  before."  If he'd have told me that before, I'd have been

 6  making the smaller payments.

 7          THE COURT:  Why did you make a $100 payment in

 8  October of 2004 if you didn't know you could make a smaller

 9  payment?

10          THE WITNESS:  I didn't -- he didn't really want to

11  accept that payment when I brought it to him, but that's all I

12  had.

13          THE COURT:  So, did you make any other offers after

14  the $100?

15          THE WITNESS:  No.

16          THE COURT:  So, for about an 18 month period you only

17  made three payments.  In fact, you only made two.  Your mother

18  made one a few days ago, prior to this hearing?

19          THE WITNESS:  Yes, sir.  You see, our living

20  situation, Your Honor, is -- is very --

21          THE COURT:  Counsel -- wait, wait, wait.  Your mother

22  was without you for several months while you were in jail,

23  right?

24          THE WITNESS:  My dad was living then.

25          THE COURT:  Okay, fine.  But at the same time, you're

 1  telling me that you couldn't make any kind of a payment?

 2              THE WITNESS:  Well, I --

 3              THE COURT:  $100, less than $100; you couldn't do

 4  anything for 18 months, except two occasions?

 5              THE WITNESS:  Yes, what -- yes, Your Honor.

 6              THE COURT:  Do you want to examine him about what I

 7  asked or about the documents, Mr. Chaney?

 8              MR. CHANEY:  Yes, sir.

 9                    *    *    *    *    *

10                    REDIRECT EXAMINATION

11  BY MR. CHANEY:

12  Q.   With respect to Mr. Manuel, didn't he tell you that you

13  needed to report to him if you were arrested?

14  A.   Yes.

15  Q.   Any new arrests?

16  A.   No.

17  Q.   You had no new arrests during this time period?

18  A.   No, sir.

19  Q.   Did Mr. Manuel tell you if there's any dispute -- at any

20  time, any dispute between you and any other person, a

21  girlfriend, about money; that you needed to report that to him?

22  A.   No, sir.

23  Q.   If he -- did he tell you if there was any dispute between

24  you and a business partner about issues relating to the

25  business that you needed to report that to him?

Michael Graves - Redirect                                69

1  A.    No, sir.

2  Q.    Did he tell you that if you ever pawned any item to try to

3  meet your obligations that you needed to report that to him?

4  A.    No, sir.

5  Q.    Okay.  And with respect to the petition that was given to

6  you, I did go over this petition with you, correct?

7  A.    Yes.

8  Q.    And in the petition there was no reference to any of the

9  things that were ultimately alleged in the dispositional

10 report, correct?

11 A.    No, sir, not in the paper that I have.

12 Q.    And, in fact, when we received the rule to revoke, I

13 visited with you and showed you what the rule to revoke had,

14 and it had the same allegations that were contained in the

15 petition, correct?

16 A.    Yes.

17 Q.    And those -- and the allegations in that rule to revoke

18 did not have any reference to any of the issues relating to

19 either Ms. Taplin or Ms. Brown or any other person, correct?

20 A.    Correct.

21 Q.    Okay.  So the first time that you saw the allegations with

22 respect to these individuals and what they were saying to your

23 supervising agent, was when I provided you -- when I read it to

24 you -- I received it yesterday afternoon and I read it to you

25 this morning, correct?

Michael Graves - Redirect                          70

1   A.   Yes.

2   Q.   And I explained to you that these additional allegations

3   were also the subject that the Court would be addressing today?

4   A.   Yes.

5   Q.   All right.  With respect to Ms. Taplin, the check --

6           MR. CHANEY:  I think he has it over there,

7   Your Honor.

8           THE WITNESS:  Yes.

9           MR. CHANEY:  I think we have both.

10          THE COURT:  All right.

11  BY MR. CHANEY:

12  Q.   The check that this -- it's a Bank One check Number 1130.

13  There's a signature there.  You said that that signature looks

14  like your signature.  Is that, in fact, your signature?

15  A.   No.

16  Q.   Okay.  Did you ever sign a check to Ms. Taplin?

17  A.   No.

18  Q.   Would it be necessary for you to sign the check to

19  Ms. Taplin on In Too Deep?  Didn't she have signature authority

20  on that account?

21  A.   Yes.

22  Q.   Okay.  So, she would not need to put -- if she needed

23  money out of In Too Deep, she would not need you to endorse

24  that, correct?

25  A.   No.

Michael Graves - Redirect                                   71

1    Q.    So, who else was a signatory on that account?

2    A.    Ronald Delaney.

3    Q.    Okay.  And with respect to the pawn receipt; this is, in

4    fact, the receipt for the rings you pawned?

5    A.    Yes.

6    Q.    Okay.

7          MR. CHANEY:  I have nothing further with respect to

8    this witness, Your Honor.

9          THE COURT:  All right.

10    (Witness is excused)

11          THE COURT:  I'm admitting Government's Number 1 the

12    pawn receipt and Government Number 2, the NSF check,

13    purportedly allegedly signed by Mr. Graves, which he disputes

14    being his signature, although he says that it appears that it

15    looks similar.  Both documents are admitted for the purpose of

16    the hearing.

17          From what I have here, gentlemen, there is a basis

18    for revoking on the failure to pay restitution.  There has to

19    be some good faith effort on payment of restitution and there

20    has been none by this Defendant.  For over 18 months now he has

21    been on supervised release.  He has been employed, making over

22    $1,600 a month for a -- even if it was for a certain period

23    between December of '04 and April of '05, he has also had other

24    employment and opportunities to make good faith payments.  He

25    has made payments of, on one occasion, of $350, which I would

72

1   take it to be the $100 special assessment fee along with the

2   $250 restitution payment, but I'm not certain how probation

3   allocated that payment in March of 2004.

4          On the October payment of 2004 of $100, obviously

5   below the restitution amount, but yet if that's all that he

6   could afford, that at least showed that he was able to make

7   something.

8          The payment by the mother in July of 2005, God bless,

9   you've got a loving mother, of $800, again is something that

10  this Defendant should have been paying himself all along his

11  supervised release term.  I don't believe a word he says in

12  terms of his inability to make a payment or his claimed lack of

13  knowledge that he couldn't make a payment of less than $250.  I

14  don't believe any of that.  He has made one before.

15         In terms of the failure to report or the failure to

16  submit written reports, you know, if Counsel wants to leave it

17  open in order to get testimony from Mr. Manuel, that's fine

18  with me.  If he wanted to get testimony in about what

19  Mr. Manuel might have told his client about the restitution

20  payments, that's fine, too.  I'll leave it open for that, for

21  that purpose.

22         Personally, Mr. Graves, to me, has perjured himself

23  in this particular hearing, not only in reference to his

24  inabilities or claimed inabilities to make restitution, all

25  right, on any amounts, $250, less or more; but also, I believe,

1   he has perjured himself in reference to his knowledge about the

2   NSF check involving Ms. Taplin and this contract.  No sane

3   person, in my view, girlfriend or not, would go in and sign a

4   contract obligating herself and her girlfriend or spouse for

5   $4,000 or more.  And he says that he does not know how

6   Ms. Alston even knew about this situation.

7         He has given inconsistent testimony concerning the

8   situation, both as to his knowledge of checks to Ms. Taplin,

9   but also I believe as to information regarding his relationship

10  and the surrounding circumstances for that NSF check.  I

11  understand his defense is that Ms. Taplin had access to the

12  checks, like he did, but it seems incredible to me to believe

13  that someone would make an NSF check claim against themselves

14  if it was indeed Ms. Taplin who signed that NSF check that's

15  Government Exhibit Number 2.

16        The other issues that we have in this particular

17  case, that I would be interested in if both sides wants to hold

18  the hearing open for further evidence, particularly for

19  Mr. Manuel or others, would be information about Mr. Graves'

20  statements that he was either on the road on certain dates and

21  he failed to report to probation as alleged in the petition, or

22  in the hospital, at Touro Hospital for a glandular problem that

23  he says on November 15 of 2004.  I would be interested in

24  finding out if there's something to support those particular

25  statements.

1          The other issue that I see that's hanging out there

2    deals with to what extent or what knowledge, if any, the DA's

3    Office has a record of Mr. Graves calling their office, where

4    he says he called and spoke to someone in that office prior to

5    this May 6th contract with the Economic Crime Unit, to deny any

6    knowledge of any NSF checks.  Now, if they have some record of

7    that, then I think it would be important to find that out.  If

8    there is no record of that, then it follows a pattern of what I

9    have just said are Mr. Graves' inconsistencies in testimony in

10   this hearing.

11         Mr. Graves has had problems before with fraud.  This

12   case grows out of a bank fraud situation.  He has had other

13   problems dealing with fraudulent situations.  His problem seems

14   to grow and grow.  I also find it peculiar, not peculiar but

15   interesting that in the periods when he's allegedly either

16   writing an NSF check or using girlfriends to buy things with

17   insufficient funds, that it was pretty much during the periods

18   that he was unemployed, at least unemployed from the trucking

19   company.  I'm not certain if there was some other job that he

20   had.  I seem to recall hearing testimony that he had some job

21   offer for some family business or operation, but that -- that

22   was apparently, I think, some time after April of 2005 when he

23   no longer worked for the trucking company.

24         Although, again, I'd like to know from the trucking

25   company, Mr. Graves says that he quit in May of 2005 but

1  according to what I heard also, is that he worked there from

2  2004 to April of 2005, at least according to what probation

3  has.  That could be another open issue.  So, I'll leave it open

4  but there is a basis for revoking on the restitution issue, and

5  unless there's something different from Mr. Manuel, we'll see

6  regarding the failures to report or submit written reports as

7  well.

8         Here is a concern of mine:  On the Booker/Fanfan, the

9  Court has discretion on applying a guideline sentence even on a

10  revocation, or applying the sentencing factors, I believe, as

11  well as weighing the guideline factors, if his supervised

12  release is revoked.  If it's revoked under the guidelines as

13  submitted to me by probation, he's looking at six to 12 months

14  imprisonment along with some possibility of supervised release

15  afterwards, again, all with the discretion of the Court to go

16  up to or below that.  But under the factors that I've mentioned

17  and given the underlying conviction that he had, under the

18  statutory range he's looking at a max, I believe, of two or

19  three years.

20         MR. CHANEY:  It's three years, Your Honor.

21         THE COURT:  Three years.

22         MR. KAMMER:  It's three years, Your Honor.

23         THE COURT:  And I had one recently where I went above

24  the guideline range, where I went to two years on a revocation.

25  I'm giving both sides notice that I am considering doing the

1  same, because I do not believe that Mr. Graves has complied

2  with the conditions of supervised release, particularly as it

3  relates to restitution payments.  Because as I said, the

4  evidence is, I think, closed on that issue.

5        But you know, I was not thinking about going above

6  the guideline range until I heard Mr. Graves' testimony and his

7  explanations about his financial situation and his quote-

8  unquote understandings of what he could pay or not pay.  His

9  explanations of his conduct with probation; it just seems

10  incredible to me that this -- that he would offer me such

11  testimony and believe I would -- I would believe that on first

12  blush.  An example, among many, is this one involving this

13  girlfriend who makes a contract to pay restitution for him on

14  an NSF check involving Ms. Taplin.

15        But after hearing that testimony is when I thought

16  that the sentencing factors here of -- and we need to impress

17  upon him that these conditions that were imposed by the Court

18  were not conditions that are negotiable.  At the same time,

19  there are conditions where he could make good faith efforts to

20  -- to make.  In an 18 month period, he has not made good faith

21  efforts to make restitution.  If he had some problem with

22  probation, all he'd have to do is contact his lawyer and the

23  lawyer could have filed some motion to seek some relief.  But

24  even without that, I've had many defendants who have paid less

25  in restitution than what was ordered on a monthly basis.  They

1  have sent in payments.  If probation had some question about

2  accepting a payment sometimes they would contact the Court or

3  seek some other relief.  I don't see that here.

4          So, he will be revoked on the restitution issue.

5  I'll leave open what sentence I'm going to give him.  I'll

6  leave open, too, whether or not either side wants to go forward

7  on the remaining issues and having Mr. Manuel come in.  I would

8  imagine you want him in, but I won't revoke him --

9          MR. CHANEY:  Well Your Honor, we'll --

10          THE COURT:  I won't revoke him on the restitution

11  issue either.  I'll leave that open so that you'll have a

12  chance to --

13          MR. CHANEY:  Respond, Your Honor?

14          THE COURT:  -- get Mr. Manuel on the record about

15  what conversations they had about the restitution payments, in

16  addition to those other issues that I mentioned, that are still

17  open.  So, but as it stands now, unless I get something

18  qualifying it, those are my thoughts and I'm sharing that with

19  both sides, particularly the thought that if he is revoked on

20  any of the conditions here, that I am thinking about going

21  above the guideline range and considering the sentencing

22  factors to do so, the statutory factors to do so.

23          All right.  We'll continue it.  How much time do you

24  need, Mr. Chaney, to get ready for completion of the hearing?

25          And also from the Government, how much time?

1          MR. KAMMER:  Your Honor, for the Government, Dall

2   Kammer.  I would request that we have -- in order to fully

3   chase out the concerns of statements that were made up here, I

4   think it would probably be prudent to order a copy of the

5   transcript of this hearing, and give us enough time to do that.

6          THE COURT:  Mr. Kammer, that's not my question.

7          MR. KAMMER:  Well, that's where I'm at.

8          THE COURT:  My question right now is:  How much time

9   do you all need to prepare and get ready for the next hearing?

10         MR. KAMMER:  Well, that's why we just need to know

11  how long.  I guess a couple -- a few weeks, Your Honor, to --

12         THE COURT:  You've been here long enough to know how

13  long it takes to get a transcript.  That's not even going to

14  take a few weeks to get a transcript.  It's going to take a

15  matter of maybe one week, at the most.

16         MR. KAMMER:  We can -- Your Honor, we can be ready

17  whenever the Court is ready to move forward.

18         MR. CHANEY:  I would ask for two weeks, Your Honor.

19  There are some things that we requested in connection with

20  this --

21         THE COURT:  I'll give you three weeks.

22         Give them three weeks down the line, Audry.  Give me

23  a date.

24         THE CLERK:  You're going to be out of town two of

25  those weeks.  You're going to be out then, and then, so we have

79

1    to go to the end of August.

2                THE COURT:  This is July 21st.

3                THE CLERK:  We're right here (indicating).  That

4    would be one, --

5                THE COURT:  One.

6                THE CLERK:  -- two --

7                THE COURT:  Three.

8                THE CLERK:  You're out.  You're out, here.  So, the

9    week of the 22nd.

10               THE COURT:  Yes.

11               THE CLERK:  "PC" is me.  When you see "PC"?

12               THE COURT:  Right.

13               THE CLERK:  That's me.

14               THE COURT:  All right.  All right, let's go to August

15   26th.  August 26th at 10:00 a.m.  August 26th, 10:00 a.m. for the

16   conclusion of the hearing.  The Court will receive further

17   evidence from both sides on all of the issues that we have

18   before us.  I'm not revoking his supervised release at any --

19   at this time on any of the grounds, including the restitution

20   grounds, until I have had a chance to hear further evidence.

21   If we fail to hear further evidence from either side, then it

22   will be revoked on the restitution.

23               MR. CHANEY:  I understand, Your Honor.

24               THE COURT:  All right.  Okay.  That's your date.

25               MR. CHANEY:  Thank you, Your Honor.

1          THE CLERK:  August 26th.

2          THE COURT:  All right.

3          THE CLERK:  Court is adjourned.

4                    *    *    *    *    *

5                  (Hearing is Concluded)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T E**

      I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

/s/Dorothy M. Bourgeois                       _7-29-05_
Dorothy M. Bourgeois                          Date